## A08A2319. GIBSON et al. v. RUSTIN.
(676 SE2d 799)

BARNES, Judge.

This is the appeal of a judgment, following a bench trial, fixing a boundary line between property owned by Robert Gibson, Virginia Gibson, the Whelchel Family Partnership, L.P., Roy Lee Gibson, Jimmy Curtis Woods, Billy Reeves, Carol C. Garrett, James H. Cain, and Bertie H. Cain (hereinafter "Appellants")[1] and Jesse Rustin following two actions to quiet title and for ejectment. The actions were consolidated for trial. The Appellants contend that the court: (1) erroneously disregarded pertinent evidence regarding the boundary line as hearsay, (2) erred by holding that the conveyor of the property could not contend a line different from that contained in the deed to Rustin, (3) erred in disregarding testimony as to the location of the "railroad iron" located on the northern portion of the disputed line, (4) erred in finding the description of the property contained in Rustin's deed to be unambiguous, and (5) erred in finding no evidence of adverse possession by Whelchel or his successor in title to support the boundary line proposed by Appellants. They also contend that the boundary line as determined by the trial court is not supported by the evidence. For the reasons set forth below, we affirm.

On appeal, a trial court's factual findings in a bench trial must be deferred to when supported by any evidence. See *Kimbrell v. Effingham Bd. of Tax Assessors*, 191 Ga. App. 544, 546 (382 SE2d 388) (1989).

As such, the sole question for determination on appeal is whether there is any evidence to authorize the trial court's judgment. It is our duty to construe the evidence to uphold the judgment rather than upsetting it. This is true regardless of whether evidence also existed that may have supported the appellant's position. In the absence of legal error, an appellate court is without jurisdiction to interfere with a judgment supported by some evidence.

---

[1] The Cains and Garrett are not parties to this appeal.

(Citations and footnotes omitted.) *Sledge v. Peach County*, 276 Ga. App. 780, 781-782 (624 SE2d 288) (2005).

The underlying dispute concerns the exact location of the boundary line joining the northeast and southeast corners of Rustin's land. The evidence showed that the disputed property, land lot 163, was once owned by a common grantor, Johnnie Whelchel. Rustin purchased a 70.95-acre tract of land from Whelchel in May 1965,[2] and the deed also referenced a 1965 survey conducted by Jacque Williams. The deed described Rustin's property as "taken from a plat drawn by [Williams] dated April 30, 1965." The plat shows a spring to the east of Rustin's property on what was then Whelchel's land, but no other natural landmarks or monuments are referenced in the deed or plat. Rustin testified that the spring was not on the land he purchased from Whelchel. The four corners of Rustin's property are established by two land lot corners, not in dispute, and points at specific distances, in dispute, on the southeastern and northeastern corners.

Rustin had his property surveyed again in 2003 by John Gaston. The Gaston survey used all of the past deeds associated with Land Lot 163, before and after Rustin's deed, to compute the outline of Rustin's property and the associated properties. The Gaston survey revealed a closure failure in the Williams survey of approximately 12 feet, but the surveyor testified that such deficiencies were acceptable in view of the less accurate equipment used in the 1965 survey. The metes and bounds on the deed's description of Rustin's property also did not coincide with the calls on the flats, which the surveyor explained to be a common scrivener's mistake during that time period.

Whelchel next conveyed a tract of land to Mattie Gibson in 1970, who conveyed a portion of that tract to her son Robert Gibson later that year. Robert Gibson testified at trial that there was no survey conducted of his property, but he and his father came up with the legal description by measuring the property. According to Gibson, Whelchel showed him that a railroad pipe had been set at the southwestern corner of the property as one corner of the Rustin and Whelchel boundary, and an iron pin located above the spring as another corner. Gibson said that he and his father surveyed the land

---

[2] Rustin's land was described as

[b]eginning to the Southwest corner of and Lot No. 163; thence North 10 deg. 58 min. E 3270 feet; thence South 88 deg. 20 min. East 1270 feet; thence South 30 deg. 32 min. West 684 feet; thence South 13 deg. 23 min. West 972 feet; thence South 25 deg. 12 min. West 765 feet; thence South 13 deg. 23 min. West 972 feet; thence South 25 deg. 12 min. West 765 feet; thence South 12 deg. 38 min. West 525 feet; thence South 52 deg. 24 min. East 710 feet; thence North 88 deg. 38 min. West 1248 feet; to the original corner and point of beginning.

based on what Whelchel told them was the boundary line and measured off "what we thought was 15 acres," followed "choppings" and set pins at the corners of his property in addition to a pin he saw above the spring, and the pipe on the corner of Rustin's property. He testified that Whelchel never saw what they marked off, and that the first time he saw Rustin's deed was "when [Rustin] put up a fuss that we was over on it." Gibson had the property surveyed in 2002 and it depicted the corners as marked by him and his father.

In 1974, Mattie Gibson also conveyed property to James Cain, her son-in-law. He testified that he walked the property line with Gibson and Whelchel, and recalled seeing "two to three pins" on the property. He also testified that his property had always contained the spring. Cain had his property surveyed in 1990 and testified that the corners on the survey were the same corners that were originally marked and designated by the pins.

In 1973, Whelchel sold a third tract along the southern portion of the Rustin property to William Holtzclaw, who then conveyed the property to Reeves in an undated deed which was recorded in 1978. Reeves testified that he walked the property lines in 1978 before he received title and that the corner pins were clearly located and in the same location. A plat done in 1973 for Holtzclaw is included in the record. The surveyor who created the Holtzclaw plat testified that he determined the boundaries of the property "entirely on the information given to [him] by Mr. Whelchel." He further testified that he put down two pins on the Northern boundary of the property and that there was a pin at the southwestern corner. He did not talk to Rustin at the time regarding the boundary, and he did not have a copy of Rustin's plat when he surveyed the property. The surveyor also testified that he found a wooden stake slightly north of the iron pin marking the southwestern corner of Rustin's property and "physical evidence of where a line had been trimmed as a part of the survey for the conveyance to [Rustin]."

The other tracts at issue are owned by Woods and Roy Lee Gibson. Woods acquired title in 1981 and 2003, and also testified that at the time he walked his property all of the corners were clearly marked by the original pins. Roy Lee Gibson acquired his property in 1997 from Whelchel's widow, and testified that Rustin told him that the "railroad iron" sticking out of the ground near his property was Rustin's property line.

The last tract bordering Rustin's land is owned by the Whelchel Family Partnership. One of the family members testified that the land had never been surveyed but that they walked the property every Thanksgiving. He also testified that Rustin indicated to him that the railroad iron was the boundary line between their properties. Whelchel was deceased at the time of the trial.

In 2005, Rustin filed a petition to remove a cloud from his title and for trespass and ejectment against only Robert and Virginia Gibson. He complained that the Gibsons had built a well-house and maintained a garden on his property and were disputing his right to build a fence. In 2007, the Appellants filed a petition against Rustin to remove cloud from their title, establish a boundary line, and for ejectment. The actions were consolidated for the subsequent bench trial.

Several experts also testified at trial, giving different opinions regarding the boundary line based upon conflicting surveys. The deed calls showed the distance from the southwest land lot to the southeastern point in dispute to be 1,248 feet, but this measurement would include the spring, which the Williams' plat shows to be east of Rustin's property line. The Appellants contend that the distance is 877.46 feet — a difference in footage of about 370 feet. The surveyors agreed that it was impossible to "run the distances and courses that are called for in the [Williams'] plat and still end up west of the spring." Following the bench trial, the trial court entered a judgment fixing the boundary line in accordance with Rustin's original 1965 survey and the Gaston 2003 survey, and testimony from Rustin regarding the location of the spring. The trial court found that the

> [d]efendants principally rely upon traditionary evidence of ancient landmarks of long standing to establish the boundary line they contend. Only the statements by Whelchel were proffered as such evidence. No evidence was proffered from any other source as to the reputation of any marker pointed out by Whelchel as the boundary line between the parties['] property. Whelchel had parted with his title to the Rustin property at the time of all such conversations or statements. He could not then contend the line separating the property from the parties was different from the line described in the deed from Whelchel to Rustin. There was no evidence of any act of adverse possession by Whelchel or his successors in title to the line they now contend. None of the property of the Defendants was fenced or otherwise enclosed. . . . The traditionary evidence proffered, whether admitted or not, was hearsay and specifically related to what Whelchel said about the property line, and thus not probative. There was no independent evidence of the reputation in the neighborhood of the boundary line dividing the property conveyed by Whelchel to Rustin. Rustin has the oldest and superior title to the land in controversy and he entered into possession of the land first. The description of the property in Rustin's deed is unambiguous except for the

plat which indicates the spring upon the Cains' land is not within the property conveyed by Whelchel to Rustin.

The trial court enjoined the defendants from trespassing on the property and awarded Rustin nominal damages against each defendant, except Garrett, in the amount of $1. It did not award attorney fees, punitive damages or expenses of litigation.

As noted above, if any evidence supports the finding of the trier of fact as to the location of markers in a boundary line dispute, the finding is not clearly erroneous and we will not disturb it on appeal. *Youngblood v. Youngblood*, 263 Ga. App. 820, 821 (1) (589 SE2d 602) (2003).

1. Appellants first contend that the trial court erred in finding that statements made by original grantor Johnnie Whelchel were hearsay and not probative.

"Traditional evidence as to ancient boundaries and landmarks shall be admissible in evidence, the weight to be determined by the jury according to the source from which it comes." OCGA § 24-3-13; *Ledford v. Hill*, 82 Ga. App. 299, 311 (7) (60 SE2d 555) (1950). "Such evidence may be resorted to in order to establish a boundary line." Id. However, testimony of what specific persons said about a specific pin is hearsay and inadmissible. *Collier v. Stokes*, 213 Ga. 464 (2) (99 SE2d 821) (1957). In *Collier*, the Supreme Court held inadmissible evidence related to what the witness had been told by her father and a surveyor over 30 years before about the location or meaning of a certain pin.

The Court's finding in *Collier* is applicable here, in that

> [t]he evidence here offered was not as to the general reputation of the pin in question or as to the witness's knowledge of the pin. What was sought was what [Whelchel] said about a specific pin. It is clear that this type of testimony was all that was ruled out by the trial judge, and that such testimony, being hearsay and inadmissible, was properly ruled out.

Id. See *Martin v. Atkinson*, 7 Ga. 228, 236 (1849) (ancient boundaries, corners, and station trees cannot generally be established otherwise than by reputation).

2. The Appellants next contend that the trial court erred in finding that Whelchel could not contend a property line different from the one in Rustin's deed.

> While one is the owner of land, what he says and does in respect to fixing the boundary thereof may be proved, and

his agreements in respect thereto will bind subsequent purchasers from him; but after an owner of land has parted with his title, his subsequent sayings and acts can not be proved to bind his prior grantee or one holding under him. [Cit.]

*Ga. Marble Co. v. Voyles*, 74 Ga. App. 312, 314 (1) (39 SE2d 488) (1946). Thus, the trial court did not err in finding that because Whelchel no longer had title to the property in question, his purported statements could not contend a boundary line different from that in Rustin's deed.

3. The Appellants also contend that the trial court erred in disregarding testimony regarding the "railroad iron." At trial, there was testimony that Whelchel identified a railroad iron sticking out of the ground near Rustin's home as the property marker. Gibson testified that he used the railroad iron as the tie line for his survey. There was also testimony that Rustin told one of the property owners that the iron was a marker. Rustin testified that he put "a little piece of flat iron" in the ground because he "knocked up" a stake that Georgia Power put down when the company replaced a power pole, and that the iron pole had only been there for "seven or eight years." Rustin removed the iron pipe before the trial.

The question of the meaning of the iron pole was for the trier of fact. "Disputed lines between adverse claimants of land, and questions of where [certain monuments] stood in the past, and how long they stood in certain localities, are peculiarly questions of fact for the [factfinder]." *Dye v. Dotson*, 201 Ga. 1, 3 (1) (39 SE2d 8) (1946).

4. The Appellants also contend that the trial court erred in finding that the property description in Rustin's deed was unambiguous. Here, the trial court found that the legal description in the deed was "unambiguous except for the plat which indicates the spring upon the Cains' land is not within the property conveyed by Whelchel to Rustin."

The construction of a contract, if needed, being a question of law for the court, as well as a duty that rests upon the court, there can be no ambiguity . . . unless and until an application of the pertinent rules of interpretation leaves it really uncertain which of two or more possible meanings represents the true intention of the parties.

*Turk v. Jeffreys-McElrath Mfg. Co.*, 207 Ga. 73, 75 (1) (60 SE2d 166) (1950). We have also deemed deeds to be "in law unambiguous," when the description in a deed is sufficient in conjunction with undisputed evidence to determine the conveyance. *Rackley v. Miller*,

200 Ga. 717 (38 SE2d 404) (1946); *Walker v. Hill*, 253 Ga. 126, 130 (1) (317 SE2d 825) (1984). Moreover,

> [w]hen a deed references a plat in describing the land conveyed, the plat will ordinarily be considered as incorporated in the deed itself. However, the plat is not given by way of more particular description, but as a pictorial representation of what has been described. It is not intended to conflict with the written description, and should not be so considered.

*Dept. of Transp. v. Meadow Trace, Inc.*, 274 Ga. App. 267, 269 (1) (617 SE2d 246) (2005). " '[T]he operative words are found in the deed itself.' " *Shepherd v. Henderson*, 169 Ga. App. 486, 486-487 (313 SE2d 503) (1984).

The deed in question, while having some inconsistencies with the plat, which were explained by a surveyor as transcription mistakes and related to the inaccuracy of the earlier surveying tools, clearly conveyed the lot described in the deed to Rustin. The conflict between the deed description and the plat does not reflect an intent to convey something other than what was specified in the deed.

Thus, the trial court did not err in finding that Rustin's deed was unambiguous.

5. The Appellants also contend the trial court erred in finding no evidence of an act of adverse possession of the disputed line by Whelchel or his successors. Again, we do not agree.

Reeves and Gibson both testified that they kept gardens on the disputed property at various times, and Gibson said that he dug a well near the line. Cain also testified at trial about a spring house he built on the property.

In the case of adjoining landowners, quite a different rule applies as to obtaining prescriptive title by adverse possession. In those cases,

> possession and use of land along the boundary line of adjoining owners is construed to be permissive; so much so that this court has held that something must be done to indicate a right of possession on the part of one neighbor, adverse to the claim of his fellow. . . . [E]ven cultivation along the line, although beyond the boundary of the coterminous proprietor, has been held by this court not to evidence adverse possession.

*Godley v. Hinely*, 165 Ga. 717, 721 (142 SE 86) (1928).

In this case, we agree that the evidence as presented was

insufficient, in these circumstances, to show adverse possession.

6. The Appellants also contend that the boundary line was not supported by the evidence. We do not agree.

Here, the southwest and northwest corners were not disputed. In fixing the boundary line, the trial court ran 1,270 feet from the northwest corner to set the northeast corner, and 1,248 feet from the southwest corner to set the southeast corner. Although the figures were disputed, there was some evidence presented at trial from which the trial court could have determined these measurements. Likewise, in connecting the northeastern and southeastern corners, the trial court utilized the calls along the original deed and excluded the spring that Rustin testified that he did not purchase.

Pursuant to OCGA § 44-4-5, with regard to determining disputed boundary lines,

> the following rules shall apply: (1) Natural landmarks, being less liable to change and not capable of counterfeiting, shall be the most conclusive evidence; (2) Ancient or genuine landmarks such as corner stations or marked trees shall control the course and distances called for by the survey; (3) If the corners are established and the lines are not marked, a straight line as required by the plat shall be run but an established marked line, though crooked, shall not be overruled; and (4) Courses and distances shall be resorted to in the absence of higher evidence.

Thus, although no natural landmarks established the boundary, it was undisputed that the spring was not on Rustin's property; thus, as there was some evidence from which the factfinder could establish the boundary lines, we affirm. See *David v. Crane*, 240 Ga. 671 (242 SE2d 131) (1978).

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED MARCH 27, 2009.

*Hulsey, Oliver & Mahar, Theodore W. Robinson*, for appellants.
*Stewart, Melvin & Frost, Frank Armstrong III*, for appellee.